# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|  |  |
|---|---|
| ANDY DOOHAN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | |
| CTB INVESTORS, LLC d/b/a PBR BIG SKY COWBOY BAR, THE CORDISH COMPANIES, INC., ENTERTAINMENT CONSULTING INTERNATIONAL, LLC, | Case No. 4:19-cv-00111-NKL |
| Defendants. | |

## ORDER

Before the Court is Defendants' motion to dismiss Plaintiff's first amended class action Complaint alleging violations of the Telephone Consumer Protection Act.[1] Doc. 33. Defendants CTB Investors, LLC d/b/a PBR Big Sky Cowboy Bar, Entertainment Consulting International, LLC, and the Cordish Companies, Inc., assert Plaintiff's claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) and (6), for lack of personal jurisdiction and failure to state a claim. For the reasons discussed below, Defendants' motion to dismiss is denied.[2]

---

[1] Also pending before the Court is a separate motion to dismiss Plaintiff's original Complaint filed by Defendant CTB Investors, LLC d/b/a PBR Big Sky Cowboy Bar on March 8, 2019. Doc. 15. On March 22, 2019, Plaintiff filed his first amended Complaint. Doc. 20. An amended Complaint generally renders moot a pending motion to dismiss the original Complaint. *See Avery v. Boyd Bros. Transp.*, No. 13-00579-CV-W-BP, 2013 WL 11326558, at *1 (W.D. Mo. Aug. 21, 2013) (denying motion to dismiss original complaint as moot because amended complaint "superseded and displaced [the] original complaint"). Therefore, the motion to dismiss by CTB Investors, LLC d/b/a PBR Big Sky Cowboy Bar, Doc. 15, is denied as moot.

[2] On October 31, 2019, the Court denied Defendants' motions to dismiss in two substantially similar TCPA class actions, each against Defendants Cordish, ECI, and a Kansas City Power &

Plaintiff's motions for leave to file supplemental authority, Doc. 55 and Doc. 58, are denied as moot.

## I. BACKGROUND

### a. The Telephone Consumer Protection Act

In 1991, Congress enacted the Telephone Consumer Protection Act in response to concerns from constituents over intrusive and unwanted telephone calls from telemarketers. Pub. L. No. 102-243, 105 Stat. 2394. The TCPA targeted automated or prerecorded calls and directed the Federal Communications Commission to implement rules consistent with the statute's goals. *Id*. The purpose of the statute was "to protect residential telephone subscriber privacy rights by restricting certain commercial solicitation and advertising uses of the telephone and related telecommunications equipment." H. R. Rep. No. 102-317, at 5 (1991).

The TCPA prohibits "any person within the United States, or any person outside the United States if the recipient is within the United States" from using an automated telephone dialing system (ATDS) to make a non-emergency call without the prior express consent of the recipient. 47 U.S.C. § 227(b)(1). A text message qualifies as a "call" within the scope of the Act. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016), as revised (Feb. 9, 2016). Though the TCPA does not define "person," the Communications Act, which the TCPA amended, states "[t]he term 'person' includes an individual, partnership, association, joint-stock company, trust or corporation." 47 U.S.C. § 153(39). The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. §

Light venue. *See Smith v. Truman Rd. Dev., LLC*, No. 4:18-CV-00670-NKL, 2019 WL 5654352 (W.D. Mo. Oct. 31, 2019); *Hand v. Beach Entertainment KC, LLC*, 4:18-CV-00668-NKL, 2019 WL 5654351 (W.D. Mo. Oct. 31, 2019).

227(a)(1). In 2015, Congress amended the ATDS definition by adding an exemption for calls "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015, Pub. L. No. 114-74, §301(a), 129 Stat. 584 (2015).

In addition to regulating the use of an ATDS, the TCPA also directed the FCC to engage in rulemaking regarding "the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1)–(2). Exempted from the statute's definition of "telephone solicitation" are calls or messages "by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4)(C). The FCC has subsequently promulgated regulations imposing liability for making telephone solicitations to persons who register their number with the national do-not-call registry, using the same definition of "telephone solicitation" included in the TCPA. 47 C.F.R. § 64.1200(c)(2). The FCC has also promulgated regulations prohibiting initiating "any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity," and prescribing certain minimum standards for such internal procedures, but exempting tax-exempt nonprofit organizations from its scope. 47 C.F.R. § 64.1200(d).

The TCPA also provides for a private right of action for violations of the § 227(b) ATDS prohibition and its corresponding regulations, 47 U.S.C. §227(b)(3), as well as a private right of action for violations of the regulations prescribed pursuant to § 227(c), 47 U.S.C. § 227(c)(5).

### b. The Current Litigation

Plaintiff Andy Doohan brings a class action suit against Defendants. The first amended Complaint states that between July 30, 2014, and April 4, 2018, Plaintiff and putative class

members received text messages that they had not consented to from Defendants advertising PBR's products and services.

Defendants are CTB Investors, LLC d/b/a PBR Big Sky Cowboy Bar ("PBR"), a limited liability company with its principal place of business in Kansas City, Missouri; the Cordish Companies, Inc. ("Cordish"), a Maryland corporation with its principal place of business in Maryland; and Entertainment Consulting International, LLC ("ECI"), a Maryland limited-liability company with its principal place of business in Maryland. PBR is a drinking establishment located within the Kansas City Live! entertainment block of the Kansas City Power & Light District, which is a retail, entertainment, office, and residential district located in downtown Kansas City, Missouri. Plaintiff alleges that Cordish and ECI effectuate and oversee all, or substantially all, of the marketing decisions of PBR and other venues, and that in that capacity Defendants have caused promotional text messages and calls to be made to Plaintiff using the ATDS systems SendSmart and Txt Live! without consent.

Plaintiff has alleged two counts against all Defendants and defined a putative class corresponding to each count:

- Count I (the "227(b)(1)(A)(iii) Class") – violations of 47 U.S.C. § 227(b)(1)(A)(iii) for using an ATDS to send text messages without consent;
- Count II (the "64.1200(d) Class") – violations of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d) for failing to implement adequate procedures to prevent calls or text messages to persons who request not to receive calls or text messages by that entity.

Plaintiff and the putative classes seek statutory damages for each violation as well as injunctive relief against future calls pursuant to 47 U.S.C. § 227(b)(3).

Defendants ECI, Cordish, and PBR together file a motion to dismiss. Defendants ECI and Cordish move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. All Defendants move to dismiss pursuant to Rule 12(b)(6) for failure to

state a claim, asserting that the statute upon which Plaintiff's claims rely contain unconstitutional provisions that are not severable.  Specifically, Defendants assert that by exempting calls made pursuant to a federal government debt from the definition of ATDS, by exempting government speakers from ATDS prohibitions, and by exempting non-profits from the definition of telephone solicitation and from prohibitions on certain calls made for telemarketing purposes, the TCPA places content-based restrictions on free speech that cannot survive strict scrutiny and are therefore in violation of the First Amendment and Equal Protection.  Moreover, they argue the statutory definition of "ATDS" is unconstitutionally vague in violation of the Fifth Amendment Due Process Clause.

Federal Rule of Civil Procedure 24 permits a non-party to intervene when the non-party "is given an unconditional right to intervene by a federal statute."  Fed. R. Civ. P. 24(a).  Rule 5.1(c) permits the United States Attorney General to intervene in an action where the constitutionality of a federal statute is challenged.  Fed. R. Civ. P. 5.1(c).  Accordingly, the Attorney General (the "Government") has intervened in this action for the purpose of defending the constitutionality of the TCPA.

## II.  PERSONAL JURISDICTION

Defendants Cordish and ECI move to dismiss the first amended Complaint, arguing the Court lacks personal jurisdiction over them as non-resident entities.  In response, Plaintiff asserts that both ECI and Cordish have the requisite minimum contacts with Missouri to make personal jurisdiction proper, and that in the alternative, PBR's contacts with Missouri can be imputed to them through an alter-ego or agency theory.[3]

---

[3] Because the Court finds that Plaintiff has made a prima facie showing that both ECI and Cordish have sufficient contacts to warrant specific personal jurisdiction, it will not address the

To survive a motion to dismiss for lack of personal jurisdiction, "a plaintiff must make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (internal quotations omitted). "The allegations in the Complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Cantrell v. Extradition Corp. of Am.*, 789 F. Supp. 306, 308–09 (W.D. Mo. 1992); *see also Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1076 (8th Cir. 2004). Although "[t]he evidentiary showing required at the prima facie stage is minimal," *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (quotations omitted), it "must be tested, not by the pleadings alone, but by the affidavits and exhibits" supporting or opposing the motion to dismiss, *Dever*, 380 F.3d at 1072 (quotations omitted).

For non-residents ECI and Cordish to be subject to personal jurisdiction in Missouri, personal jurisdiction must be proper under both the Missouri long-arm statute and the Due Process Clause. Where, as here, a court's subject matter jurisdiction is based upon a federal statute that is silent regarding service of process, the Court "may exercise personal jurisdiction only to the extent permitted by the forum state's long-arm statute." *Velez v. Portfolio Recovery Assocs., Inc*., 881 F. Supp. 2d 1075, 1082 (E.D. Mo. 2012). In relevant part, Missouri's long-arm statute authorizes personal jurisdiction over defendants who transact business or commit a

---

parties' alternative arguments for and against imputing PBR's contacts onto the other Defendants on an agency or alter-ego theory at this stage.

tort within the state, as to any cause of action arising from the commission of such acts. Mo. Rev. Stat. § 506.500.1. "A person or firm transacts business by visiting Missouri or sending its product or advertising here." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 476 (8th Cir. 2012). Missouri courts have interpreted the "tortious act" prong to include "[e]xtraterritorial acts that produce consequences in the state." *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. 2010). These categories are construed broadly, such that if a defendant commits one of the acts specified in the long-arm statute, the statute will be interpreted "to provide for jurisdiction . . . to the full extent permitted by the [D]ue [P]rocess [C]lause." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 593 (8th Cir. 2011) (quotations omitted).

To satisfy due process a defendant must have "sufficient minimum contacts" with the forum state so as not to "offend traditional notions of fair play and substantial justice." *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (quotations omitted). Personal jurisdiction can be specific or general.[4] For specific jurisdiction to exist, "the injury giving rise to the lawsuit [must have] occurred within or had some connection to the forum state, meaning that the defendant[s] purposely directed [their] activities at the forum state and the claim arose out of or relates to those activities." *Johnson*, 614 F.3d at 795 (citation omitted). In determining whether a nonresident defendant's contacts with Missouri are sufficient to subject it to personal jurisdiction, the Court considers five factors, the first three of which are the most important: "(1) the nature

---

[4] In Plaintiff's first amended Complaint, he implies that Defendants may also be subject to general jurisdiction, because "Defendants' affiliations with the state of Missouri are so continuous and systematic as to render them at home in this District, because Defendants' regular and systematic corporate decision-making is made in Kansas City, Missouri." Doc. 20, ¶ 10. In their motion to dismiss, Defendants argue ECI and Cordish are not subject to general jurisdiction, and Plaintiff does not contest this in his response. Therefore, the Court will treat Plaintiff's argument as one for specific rather than general jurisdiction.

and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Id.* at 794.

Although "[e]ach defendant's contacts with the forum State must be assessed individually," *Calder v. Jones*, 465 U.S. 783, 790 (1984), "[n]aturally, the parties' relationships with each other may be significant in evaluating their ties to the forum," *Rush v. Savchuk*, 444 U.S. 320, 332 (1980).

>   **a. Whether Plaintiff has made a prima facie showing that ECI and Cordish fall within the Missouri long-arm statute**

As an initial matter, Plaintiff has made a prima facie showing that ECI's and Cordish's alleged conduct giving rise to Plaintiff's cause of action falls within the Missouri long-arm statute.[5] Plaintiff has alleged Defendants "transact significant amounts of business within this District," Doc. 20, ¶ 8, and provided evidence that ECI and Cordish maintain offices and officers or employees in Kansas City, and that ECI is registered as a foreign limited liability corporation with the state of Missouri and has executed an operating agreement with PBR to provide marketing services. *See* Doc. 49, pp. 4–9. Plaintiff has further alleged that all Defendants, including Cordish and ECI, and/or their agents, utilized SendSmart and Txt Live! to send

---

[5] Plaintiff asserts that "if jurisdiction comports with Due Process requirements—as here—then it is also proper under Missouri's long-arm statute." Doc. 49, p. 3. However, the Eighth Circuit has made clear that Missouri courts intend the state long-arm statute and Due Process inquiries to be distinct. *See Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (finding that "[w]hile [Missouri's] long-arm statute extends jurisdiction to the limits of the Due Process Clause, it does so only for acts within its enumerated categories . . . True, courts have often treated the statutory and constitutional inquiries together . . . The inquiries, however, are separate.")

unconsented text messages in Missouri to advertise the services of PBR to the putative class using an ATDS, giving rise to this cause of action. *See* Doc. 20, ¶¶ 48–60. These allegations sufficiently state a claim of a tortious act that has produced in-state consequences under the TCPA.

Defendants have not argued the behavior alleged here falls outside of the scope of Missouri's long-arm statute. The affidavits they present do not rebut Plaintiff's contention that they have transacted business in Missouri or that their actions, even if extraterritorial, may have produced consequences in the state. To the extent that the affidavit presented by Defendants stating that Cordish is a "passive company" without employees may imply it could not engage in tortious conduct, this is countered by Plaintiff's showing that Cordish owns and manages businesses around the country, and the Court must resolve this factual conflict in the nonmovant's favor at this stage of the proceedings. Therefore, Plaintiff has made a prima facie showing that Defendants' conduct falls within the scope of the Missouri long-arm statute. *See Schwartz & Assocs. v. Elite Line, Inc.*, 751 F. Supp. 1366, 1369 (E.D. Mo. 1990) (finding allegations that a Defendant fraudulently induced Missouri plaintiff to perform legal services from out-of-state were sufficient to support exercise of personal jurisdiction under the Missouri long-arm statute); *KCI Auto Auction, Inc. v. Anderson*, No. 5:17-CV-06086-NKL, 2018 WL 665313, at *4 (W.D. Mo. Feb. 1, 2018) ("KCI argues that the consequences of Anderson's tortious acts were primarily felt by KCI, in Missouri. Anderson has provided no defense, and thus KCI presents a sufficient prima facie showing that Anderson is within the reach of Missouri's long-arm statute.") Because "'the Missouri long-arm statute authorizes the exercise of jurisdiction over non-residents to the extent permissible under the due process clause,' this court considers 'whether the assertion of personal jurisdiction would violate' due process." *Aly*

*v. Hanzada for Imp. & Exp. Co., LTD*, 864 F.3d 844, 849 (8th Cir. 2017) (quoting *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136 (8th Cir. 2015)).

### b. Whether Plaintiff has made a prima facie showing that ECI has sufficient minimum contacts with Missouri

Defendants argue that ECI lacks sufficient minimum contacts with Missouri and thus should not be subject to personal jurisdiction here because none of the alleged conduct took place in Missouri as ECI is headquartered in Maryland, no ECI employee directly engaged in sending the text messages at issue, and ECI directs its consulting services to venues across the country, not specifically toward Missouri.[6] Therefore, ECI has not aimed its conduct into the forum state. Plaintiff responds that personal jurisdiction over ECI is proper because ECI was heavily involved in developing, instituting, and overseeing the data collection and text message campaigns carried out by PBR and other Kansas City Power & Light venues, including coordinating the SendSmart and Txt Live! programs and providing materials for data collection. Further, ECI is registered to do business in Missouri as a foreign limited liability corporation and

---

[6] Defendants also argue that Plaintiff "asserts no allegations that allow the Court to evaluate [ECI's and Cordish's] contacts with the forum related to this action," and "this failure alone is sufficient to conclude the Court lacks specific jurisdiction over [ECI and Cordish]." Doc. 34, p. 7. Given the Court's discussion herein of each of Plaintiff's allegations that permit the Court to evaluate personal jurisdiction over ECI and Cordish, this argument is rejected. The authorities cited by Defendants do not persuade the Court otherwise. *See, e.g.*, *Goans Acquisition, Inc., v. Merchant Solutions, LLC, et al.*, No. 12-00539-cv-S-JTM, 2012 WL 4957628 (E.D. Mo. Oct. 16, 2012) (finding it could not exercise personal jurisdiction where the Plaintiff relied exclusively on the Complaint's allegations in opposing a motion to dismiss, and the complaint "contain[ed] no allegations specifically naming" two Defendants and "offer[ed] no specific information about" those Defendants); *Nexgen HBM, Inc. v. Listreports, Inc.*, No. 16-cv-3143-SRN/FLN, 2017 WL 4040808 (D. Minn. Sept. 12, 2017) (after finding that the plaintiff "fail[ed] to distinguish between each Defendant's conduct," continuing with the personal jurisdiction analysis by parsing out the allegations and evidence against each individual defendant).

has employees living and working out of Kansas City in concert with Kansas City Power & Light district venues, including PBR.

As an initial matter, Defendants' assertion that because ECI is incorporated in Maryland, "none of their actions took place in Missouri" is unavailing. ECI's headquarters location does not prevent them from acting in other locations, and even if it did, the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

As to the nature, quality, and quantity of ECI's contacts with Missouri, Plaintiff has demonstrated a number of contacts between ECI and the state. He points to ECI's registration as a foreign limited liability company with Missouri; ECI employees who operate out of Kansas City and participated in the coordination of the SendSmart and Txt Live! programs with Kanas City Power & Light venues; ECI President Reed Cordish's appointment of an ECI employee as a non-managing member of PBR and other venues in the Kansas City Live! block of the Power & Light district who also participated in the coordination of marketing programs; testimony from a Kansas City Live! employee that she communicated with ECI employees as frequently as "daily" regarding marketing programs; testimony from a Kansas City Power & Light employee that he worked with two ECI employees to develop Txt Live!, and reported directly to an ECI Senior Vice President; the operating agreement between ECI and PBR stating the agreement was "negotiated, executed, delivered, and intended to be performed" in the Western District of Missouri, as the location of PBR; ECI's contract with a Kansas City software developer to create the Txt Live! program; testimony that the data cards venues used to collect contact information were provided to venues by ECI; and finally, a variety of emails between ECI employees, Kansas City Power & Light employees, and employees of individual venues

including PBR, communicating policies with respect to marketing and implementation of the alleged ATDS systems at issue. *See* Doc. 49, pp. 4–9. These contacts demonstrate that ECI was in consistent communication with Kansas City Power & Light venues in order to develop, implement, and coordinate the SendSmart and Txt Live! systems, including having employees working from Kansas City and the President of ECI Reed Cordish signing off on the marketing programs being implemented. Doc. 49, pp. 6–7. These contacts are not random or fortuitous but purposeful and directed at the Missouri venues here, including PBR.

As to the third factor, Plaintiff has also demonstrated a direct relationship between the contacts and the cause of action here. ECI executed an operating agreement with PBR in which it agreed to "provide web-based and paid advertising and marketing services [for PBR]". Doc. 49, p. 11. Plaintiff alleges that "[a]mong the suite of services that ECI coordinates and directs for all Cordish bars and restaurants, including PBR, is the ability to mass text message potential customers." Doc. 20, ¶ 43. Plaintiff also provides evidence that ECI was an account holder of SendSmart and the coordinator of Txt Live!, the two systems Plaintiff contends were used to send the messages at issue here. Doc. 49, pp. 6–7. The evidence Plaintiff cites indicates that ECI manages the website that venue employees use to upload consumer cell phone numbers and create text message campaigns, and that ECI developed and enforced the policies and procedures for executing text messaging campaigns and collecting lists of consumers' names and phone numbers for use in campaigns for Kansas City Power & Light venues, including PBR. Doc. 20, ¶¶ 44–46; Doc. 49, pp. 6–8. These are the campaigns that Plaintiff alleges he was contacted through. Though Defendants present an affidavit stating it was ECI's policy to not send text messages, Doc. 34-3, that ECI employees did not themselves send the text messages is not determinative of personal jurisdiction. Due process only requires the cause of action to arise out

of or relate to a defendant's contacts with the forum state. *Johnson*, 614 F.3d at 795. Plaintiff's claim that he received text messages from PBR as part of mass text message campaigns directly relates to ECI's development and coordination of PBR's text message campaigns. Thus, the first three factors of the jurisdictional inquiry weigh in favor of the Court's exercise of specific personal jurisdiction over ECI.

As to the final two factors, Plaintiff has provided evidence that Defendants sent over thirty-thousand text messages to phones with Missouri area codes, some of which belong to class members. Doc. 49, p. 9. Missouri "obviously has an interest in providing a forum for [its] resident[s] . . ." *K-V Pharm. Co.*, 648 F.3d at 595; *see also Frank v. Gold's Gym of N. Augusta*, No. CV 18-447(DSD/KMM), 2018 WL 3158822, at *3 (D. Minn. June 28, 2018) (finding it "generally true" that a forum state "has an interest in providing a forum for its citizens harmed by violations of the TCPA"). Plaintiff also contends the venue is convenient for all other parties because PBR, evidence, witnesses, ECI employees, and the bulk of the putative class are located in Missouri. Defendants do not argue otherwise. Therefore, these two factors support Plaintiff's prima facie showing.

Plaintiff's uncontroverted allegations in conjunction with the evidence offered establish a prima facie showing that ECI has sufficient minimum contacts with Missouri. All five factors weigh in Plaintiff's favor, and Defendants' evidence does not diminish this showing. ECI purposefully directed its activities at Missouri when it registered to do business in Missouri, installed employees in Missouri, and substantially involved itself with developing and implementing, through consistent and prolonged communication with PBR and other Missouri venues, the alleged text message system at issue. ECI's contacts with Missouri are such that ECI "should reasonably anticipate being haled into court" here. *Burger King Corp.*, 471 U.S. at 747.

At this stage of the proceedings, Plaintiff has satisfied the "minimal" burden of making a prima facie showing that personal jurisdiction exists as to ECI. ECI's motion to dismiss for lack of personal jurisdiction is denied.

### c. Whether Plaintiff has made a prima facie showing that Cordish has sufficient minimum contacts with Missouri

In their motion to dismiss, Defendants argue Cordish does not have sufficient minimum contacts with Missouri, because none of the alleged conduct took place in Missouri, Cordish does not have any employees and therefore could not have been engaged in sending text messages, and Cordish does not own any property but rather is a passive company with a "trade name [that] is often used to describe real estate developments located around the country". Doc. 34, p. 8. Plaintiff argues personal jurisdiction over Cordish is proper, because not only did they participate in the oversight, development, and use of the ATDS as well as creation of the data collection policy used to promote Missouri venues to Missouri customers, but Cordish also has a physical presence in the state through its executives, office, and ownership interests located here.

The only evidence Defendants provide to counter Plaintiff's allegations with respect to Cordish is the affidavit by Robert Fowler who is an attorney for CTR Management, Inc., a Maryland corporation that provides real estate development services, including to properties associated with Cordish. In relevant part, the Fowler affidavit states Cordish "is a passive company that does not have any employees and does not own any property, including in the state of Missouri," and that rather, "Cordish functions primarily as a trade name often used to describe real estate developments around the country, which are each owned by a separate and distinct legal entity." Doc. 34-2. At this stage, the Court must take Plaintiff's allegations as true to the extent they are uncontroverted by Defendants' affidavits. *Cantrell,* 789 F. Supp. at 308–09. However, Plaintiff does not rely solely on allegations to support his contention that Cordish

operates out of Kansas City and owns and manages businesses there; rather, he rests these allegations on Cordish's own statements asserting those facts.[7]  *See* Doc. 20, ¶¶ 38–39; Doc. 49, pp. 5–6.  In addition, Defendants' contention that "Cordish has no employees and therefore no individual could possibly be engaged in sending text messages," Doc. 34, p. 7, is countered to some degree by Plaintiff's showing that Cordish does have individuals working on its behalf in some capacity, including Cordish's website listing Reed Cordish as a Cordish principal and Nick Benjamin as a Cordish executive, as well as individuals using an email address with the @cordish.com domain.  At this stage, the Court is required to resolve these factual conflicts in Plaintiff's favor.

Turning to the minimum contacts analysis, with respect to the nature, quality, and quantity of Cordish's contacts with Missouri, Plaintiff has demonstrated a variety of contacts.

---

[7] In 2015, Cordish was the defendant in a personal injury suit where its ownership of the Maryland Live! Casino was at issue. The plaintiff there pointed to statements on Cordish's website similar those Plaintiff points to here, including the identical statement that Cordish "still owns and manages virtually every business it has created." *Stocks v. Cordish Companies, Inc.*, 118 F. Supp. 3d 81, 85 (D.D.C. 2015).  Cordish there also submitted an affidavit stating that it "does not own Maryland Live! and that none of its employees work at the casino or were involved in the incident." *Id*.  The District of Columbia district court reviewed the contradictory showings:

> Cordish acknowledges that its website contains statements suggesting it owns Maryland Live!. But it states that "[t]hose statements on the website are inaccurate," and that these "inaccurate references were made in an effort to demonstrate to viewers of the website that The Cordish Companies, Inc. was involved as a developer of the casino and to further the marketing of The Cordish Companies, Inc. as a developer in the Gaming and Lodging industry." Cordish represented to the court in mid-March 2015 that, "[g]iven the lack of clarity caused by the inaccurate statements on the websites identified above, the websites are being revised to remove the incorrect information concerning ownership and operation of the Maryland Live! Casino." As of the filing of this memorandum opinion, however, Cordish's website contains the very same statements identified by Plaintiff.

*Id*. (internal citations omitted).  It appears that four years later, Cordish has still not removed these statements from its website.

Plaintiff produced evidence that Cordish claims to own and manage several developments in Missouri, including the Kansas City Power & Light District, citing to Cordish's website stating that it "owns and manages virtually every business it has created," as well as other Cordish statements claiming the Power & Light District as a "Development[] Owned and Managed," Doc. 20, ¶ 38–39, and listing Kansas City Live, LLC, which is a part of the Power & Light District, and Defendant CTB Investors, LLC, as its "subsidiaries." *Id*. at ¶ 11. Cordish's website also states that Cordish has a Kansas City office out of which it manages the Kansas City Live! entertainment block, and that Cordish has an executive operating out of Kansas City. Doc. 49, p. 5–6. Plaintiff points to multiple individuals with an email address utilizing the @cordish.com domain name who are also in prominent positions at ECI or Kansas City Power & Light, and who are in daily contact with an employee of Kansas City Power & Light about marketing strategies for local venues. Doc. 49, p. 6. Plaintiff further alleges Cordish and ECI have exclusive and complete control over PBR's operation, including its marketing and promotion, Doc. 20, ¶ 14, and that Cordish uses its self-proclaimed asset Txt Live! to provide mobile marketing services to PBR and other venues, Doc. 20, ¶ 43. These services include the ability to mass text message potential customers. *Id*.

Plaintiff's showing concerning Cordish's relationship with ECI is also relevant. Though the Court does not impute ECI's contacts onto Cordish, the nature of Plaintiff's allegations about Cordish's organization indicate that "the parties' relationships with each other may be significant in evaluating their ties to the forum." *Rush*, 444 U.S. at 332. Though Plaintiff acknowledges ECI is a separate entity, he alleges ECI was created by Cordish and functions "part and parcel of Cordish itself. Cordish uses [ECI], along with numerous holding corporations or 'subsidiary entities,' such as Kansas City Live, LLC, to develop, implement, manage, and operate multiple

16

entertainment district (and dozens of bars and restaurants within those districts) across the country, including PBR." Doc. 20, ¶ 41. A principal of Cordish, Reed Cordish, is also the President of ECI and has overseen the development of the Txt Live! policies and software that PBR used. Doc. 49, pp. 6–7. This assortment of contacts indicates that there are Cordish executives or affiliates working closely with, and even as a part of, both ECI and Kansas City Power & Light, and exercising control over the development and implementation of the messaging system and campaigns, all in the service of the entities Cordish claims to own and manage.

It is true that generally, "telephone calls, written communications, and . . . wire-transfers to and from a forum state do not create sufficient contacts to comport with due process such that" a court can properly exercise personal jurisdiction over a foreign defendant. *Eagle Tech. v. Expander Ams., Inc.*, 783 F.3d 1131, 1137 (8th Cir. 2015). However, Plaintiff has presented evidence of more than just calls, written communications, or wire-transfers. Rather, the evidence presented indicates Cordish may have a physical presence in Kansas City through its executive and office, and may own and manage Kansas City Power & Light and Kansas City Live!, the entertainment district that houses PBR. Taken together, Cordish's contacts permit the first two factors to weigh in favor of finding personal jurisdiction is proper over Cordish. *Cf. Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226 (8th Cir. 1987) (holding personal jurisdiction was not proper over Defendant and finding of particular significance that defendant law firm "does not maintain an office in South Dakota nor do any of its attorneys reside there or maintain a license to practice law there," "never advertised or solicited business in South Dakota," and "did not actively seek out [the South Dakota plaintiff] as a client").

As to the third factor, specific jurisdiction requires that "the litigation results from alleged injuries that 'arise out of or relate to' [Defendants'] activities." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 912–13 (8th Cir. 2012). The Eighth Circuit has "not restricted the relationship between a defendant's contacts and the cause of action to a proximate cause standard. Rather, we have said specific jurisdiction is warranted when the defendant purposely directs its activities at the forum state and the litigation 'result[s] from injuries ... relating to [the defendant's] activities [in the forum state.]'" *Id.* (quoting *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)).

Cordish's own statements indicate it owns and manages Kansas City Power & Light and Kansas City Live!, entities which Plaintiff's exhibits demonstrate were involved in crafting and orchestrating the text message policies. Plaintiff also provides evidence that Cordish was an account holder of SendSmart, the first text messaging system allegedly used to send messages to consumers. Doc. 49, p. 6. Moreover, Plaintiff has shown individuals affiliated with Cordish were included in conversations with PBR on executing the text message campaign. *Id.* at 6–7.

Defendants contend that the contacts Plaintiff has demonstrated are "irrelevant" because "none of these purported contacts evidence any involvement by [ECI and Cordish] with the text messages allegedly sent to Plaintiff." Doc. 51, p. 5. However, the "arise out of or relate to" standard is not so strict. In *Myers*, the Eighth Circuit found an Illinois casino's advertisements targeting customers in Missouri were sufficiently related to a tort action arising from injuries incurred after Plaintiff visited the casino, because although the "injuries did not arise out of Casino Queen's advertising activities in a strict proximate cause sense, his injuries are nonetheless related to Casino Queen's advertising activities because he was injured after responding to the solicitation." *Myers*, 689 F.3d at 913. Plaintiff's assertion that Cordish, through and in concert with ECI and PBR, developed and executed a mass text messaging

system to target PBR customers and expand their customer base "relates to" Plaintiff's cause of action claiming he and the putative class received a mass text message from PBR using that same system. Plaintiff provides emails between ECI, PBR, individuals with @cordish.com email addresses, Reed Cordish, and other Kansas City Power & Light employees and venues communicating detailed use policies and engaging in regular oversight of venues' use of the Send Smart and Txt Live! systems over the course of the four-year class period. These contacts relate to Plaintiff's cause of action here. The third factor weighs in favor of finding personal jurisdiction.

As to the final two factors, Plaintiff has demonstrated Defendants sent over thirty-thousand messages to phones with Missouri area codes, some of which belong to class members. Doc. 49, p. 9. Missouri "obviously has an interest in providing a forum for [its] resident[s] . . ." *K-V Pharm. Co.*, 648 F.3d at 595. Further, because Plaintiff has presented evidence that Defendant has an officer and an office in Missouri, as well as evidence that Defendant owns and manages multiple properties in Missouri, there is no reason to believe the maintenance of the action in Missouri would be unduly burdensome to Cordish, and Defendants do not assert it would be inconvenient. Plaintiff also notes that the venue is convenient for all other parties, because PBR, evidence, witnesses, and the bulk of the putative class are located in Missouri. Therefore, these two factors support Plaintiff's prima facie showing.

Taking as true all uncontroverted allegations and resolving all factual conflicts in Plaintiff's favor, Plaintiff has met his "minimal" burden of presenting a prima facie case that Cordish should be subject to personal jurisdiction. Cordish's contacts with Missouri are not so random, attenuated, or fortuitous that it could not reasonably anticipate being haled into Missouri court. Cordish's motion to dismiss for lack of personal jurisdiction is denied.

## III.   CONSTITUTIONAL CLAIMS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Defendants assert that Plaintiff's first amended Complaint should be dismissed, because it is premised on an unconstitutional statutory framework.[8]  Specifically, Defendants contend that the government-debt exception, the government-speaker exception, and the non-profit exception each violate the First Amendment Free Speech Clause and Equal Protection.  Defendants also contend the TCPA's definition of the term ATDS is unconstitutionally vague in violation of the Fifth Amendment Due Process Clause.  Finally, Defendants assert that the unconstitutional provisions are not severable from the TCPA, and therefore the entire statute should be struck down.

---

[8] Defendants' motion to dismiss roots part of their arguments about the unconstitutionality of the government-speaker exemption and the non-profit exemption in Orders and regulations promulgated by the FCC.  The Administrative Orders Review Act provides that the Court does not have jurisdiction to review the constitutionality of orders and regulations promulgated by the FCC, even if raised defensively.  *See* 28 U.S.C. § 2342(1); *United States v. Neset*, 235 F.3d 415, 420 (8th Cir. 2000) (holding the "district court lacked subject matter jurisdiction over Neset's affirmative defenses attacking the validity of the microbroadcasting regulations").  At oral argument, Defendants clarified they sought to challenge the constitutionality of only the TCPA statute.  Therefore, the Court will not consider Defendants' arguments with respect to FCC orders and regulations in its analysis.

### a. First Amendment

The First Amendment prevents Congress from enacting laws "abridging the freedom of speech." U.S. Const. amend. I. It is well established that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests" under strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc., v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991)). A regulation is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 2227. A facially content-based speech regulation "defin[es] regulated speech by particular subject matter," and is subject to strict scrutiny regardless of the government's purpose in enacting the restriction. *Id*. at 2227–28. Other restrictions more subtly "defin[e] regulated speech by its function or purpose" or while appearing facially content-neutral, "cannot be justified without reference to the content of the regulated speech." *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). These restrictions are also considered content-based and are thus subject to strict scrutiny. *Id*. However, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 914 (8th Cir. 2017) (quoting *Ward*, 491 U.S. at 791). Restrictions on speech that are content-neutral are subject to a lower, intermediate level of scrutiny.

Following the *Reed* framework, the Court must first decide whether the provisions objected to are a content-based restriction on speech to determine whether strict or intermediate scrutiny applies. Next, the Court will analyze the statute under the applicable level of scrutiny.

Finally, if it finds a provision fails the relevant level of scrutiny, the Court will need to determine if the provision is nevertheless severable from the TCPA.

### i. ATDS Government-Debt Exemption

In relevant part, the TCPA as modified by Congress' 2015 amendment provides that it shall be unlawful for any person to make a call using an ATDS "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). Defendants argue that "[o]n their face, the ATDS restrictions discriminate based on a call's content . . . i.e., a caller may use an ATDS to collect a government debt, but not, for example, to inform someone about a beneficial service, or . . . communicate with a customer." Doc. 34, p. 11. Defendants contend that these content-based restrictions are subject to strict scrutiny, that they fail strict scrutiny, and that they are not severable from the remainder of the statute.

As a preliminary matter, the Government argues this Court should consider severance prior to reaching the constitutionality of the government-debt exception to avoid unnecessary constitutional adjudication. They assert that the Court should first make a severability determination, and if the challenged provision is severable and severance would provide no relief, the Court may decline to determine the constitutionality of the government-debt exception.

The cases Defendants cite to support this argument incorporate the severability analysis into the standing inquiry. *See I.N.S. v. Chadha*, 462 U.S. 919, 931 (1983) (considering severability before going on to consider constitutionality where Congress had argued the appellant "lacks standing to challenge the constitutionality of the one-House veto provision

because he could receive no relief even if his constitutional challenge proves successful");

*Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (2006) (rejecting Plaintiff's overbreadth challenge because "[s]ince most of the content based restrictions and procedural mechanisms which Advantage claims violate the First Amendment rights of other parties were not factors in the denial of its own permit applications, it cannot show causation with respect to them. These challenges fail for lack of constitutional standing." (internal citation omitted)).

However, in the First Amendment context where a party is arguing a statute is underinclusive, the Supreme Court has rejected such arguments. In *Arkansas Writers' Project, Inc. v. Ragland*, a Plaintiff magazine challenged as unconstitutionally underinclusive under the First Amendment a state statute that subjected the magazine to a sales tax while exempting newspapers. 481 U.S. 221 (1987). The state court found that "it would avail appellant nothing if it wins its argument . . . It is immaterial that an exemption in favor of some other taxpayer may be invalid, as discriminatory. If so, it is the exemption that would fall, not the tax against" the Plaintiff. *Id*. at 226 (internal citations and alterations omitted). The Supreme Court rejected this argument, finding "[w]e do not accept the Commissioner's notion of standing, for it would effectively insulate underinclusive statutes from constitutional challenge, a proposition we [have] soundly rejected . . . The Commissioner's position is inconsistent with numerous decisions of this Court in which we have considered claims that others similarly situated were exempt from the operation of a state law adversely affecting the claimant." *Id*. at 227 (listing cases). *See also Orr v. Orr*, 440 U.S. 268, 272 (1979) ("We have on several occasions considered this inherent problem of challenges to underinclusive statutes, and have not denied a plaintiff standing on this ground" (internal citations omitted)).

In the context of the TCPA, a New York district court also considered and rejected a similar argument. In *Mejia v. Time Warner Cable, Inc.*, defendants Time Warner moved to dismiss a TCPA claim by alleging the government-debt exemption rendered the statute underinclusive and therefore unconstitutional. No. 15-CV-6445 (JPO), 2017 WL 3278926 (S.D.N.Y. Aug. 1, 2017). Plaintiff and the Government responded by asserting that the severability of the provision should be decided first, as it implicated Defendants' standing to challenge the exemptions. The *Mejia* court rejected this argument based on the nature of an underinclusiveness challenge:

> Time Warner is challenging the statute's underinclusiveness—that is, imposing liability for its calls but not for analogous calls placed for the purposes of debt collection. Put another way, Time Warner is not directly challenging the imposition of liability for its conduct in the first instance—which on its own would certainly be constitutional. Rather, Time Warner is disputing Congress's ability to penalize its conduct *while at the same time* immunizing others' conduct, solely on the basis of the content of the communications at issue . . . So too with the incarnation of this argument in the guise of severability. Severability is a question of remedy, to be addressed once a constitutional violation has been identified . . To treat severability as an issue of justiciability would risk insulating underinclusive statutes from constitutional challenge, as it would foreclose challenges by parties liable under a rule made unconstitutional by a potentially severable exception.

*Id*. at 12–13. Therefore, this Court will not avoid invalidating an unconstitutional provision of law alleged to be underinclusive because severance would not affect Defendants' eventual liability under the TCPA. *See also Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292, 2319 (2016) (rejecting defendants' argument that a severability clause in a Texas abortion law precluded facial invalidation and required a "more narrowly tailored judicial remedy." The Supreme Court found that "[t]he provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion. . . if a severability clause could impose such a requirement on courts, legislatures would easily be able to insulate

unconstitutional statutes from most facial review"); *Perrong v. Liberty Power Corp.*, No. CV 18-712 (MN), 2019 WL 4751936, at *3 (D. Del. Sept. 30, 2019) (rejecting the Government's argument that Defendants did not have standing to challenge the TCPA because severing the government-debt collection exemption would leave the possibility of liability under the remaining portion).

Therefore, the Court will first address the constitutionality of the government-debt exemption and then turn to severability.

### 1. Whether the government-debt exception is content-based

Under *Reed*, the threshold question is whether the provision, on its face, is content-neutral. *Reed*, 135 S. Ct. at 2228 ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech.").

Two courts of appeals have recently found the government-debt exception to be a content-based restriction on speech. In *Duguid v. Facebook, Inc.*, the Ninth Circuit reviewed a challenge to the government-debt exception by defendant Facebook. 926 F.3d 1146 (9th Cir. 2019). The Ninth Circuit first considered whether the statute was content neutral on its face, and concluded "it is obvious from the text that the debt-collection exception's applicability turns entirely on the content of the communication—i.e. whether it is 'solely to collect a debt owed to or guaranteed by the United States.'" *Id*. at 1153 (quoting 47 U.S.C. §227(b)(1)(A)(iii)). The Fourth Circuit in *American Association of Political Consultants, Inc., (AAPC) v. Federal Communications Commission* determined the same, holding that "the debt-collection exemption to the automated call ban facially distinguishes between phone calls on the basis of their content." 923 F.3d 159, 166 (4th Cir. 2019). Several district courts have also concluded the

government-debt exception is content-based.  *See, e.g.*, *Perrong*, 2019 WL 4751936;  *Katz v.*

*Liberty Power Corp., LLC*, No. 18-CV-10506-ADB, 2019 WL 4645524 (D. Mass. Sept. 24,

2019);  *Gallion v. Charter Commc'ns Inc.*, 287 F. Supp. 3d 920 (C.D. Cal. 2018);  *Greenley v.*

*Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128 (D. Minn. Sept. 2017);  *Mejia v. Time*

*Warner Cable Inc.*, No. 15-CV-6445, 2017 WL 3278926 (S.D.N.Y. Aug. 2017);  *Holt v.*

*Facebook, Inc.*, 240 F. Supp. 3d 1021 (N.D. Cal. Mar. 2017);  *Brickman v. Facebook, Inc.*, 230

F. Supp. 3d 1036 (N.D. Cal. Jan. 2017).

The Court agrees.  On its face, the government-debt exception clearly applies only where

the call was made "solely to collect a debt owed to or guaranteed by the United States."  47

U.S.C. § 227(b).  The only way to determine whether a call falls within this exemption is to

examine whether the subject of the call was to collect a government debt.

Analogizing to an Eighth Circuit decision reviewing a state analogue of the TCPA, the

Government argues that the government-debt exemption is content-neutral, because it is based

"principally on the relationship between the two parties—namely the relationship between the

government and a debtor."  Doc. 53, p. 9.  In *Van Bergen*, the Eighth Circuit reviewed the

Minnesota statute regulating the use of automatic dialing-announcing devices to determine

whether the statute's three exemptions violated the First Amendment.  *Van Bergen v. State of*

*Minn.*, 59 F.3d 1541 (8th Cir. 1995).  The three exemptions at issue were "messages to

subscribers with whom the caller has a current business or social relationship; messages from

schools for parents, students, or employees; and messages to employees advising them of work

schedules."  *Id*. at 1550.  The Eighth Circuit found that each of these exemptions were content-

neutral, because they "exempt certain groups from the restrictions, not on the basis of the content

of their message, but on the basis of their relationship with the subscriber."  *Id*.  A key detail was

that each of the relationships identified in the exemptions involved an established business, social, or educational relationship, and the exemptions "merely identify groups of subscribers that perforce already have consent to contact the subscriber, and who do not have to go through the formality of obtaining additional specific consent to satisfy the statute." *Id*. at 1551.

It is true that calls made pursuant to the government-debt exception may relate to the relationship between the federal government and a debtor. However, on its face, the statute does not limit the exemption on that basis. The provision explicitly limits its applicability to when the content of the call is for the purpose of collecting a government debt. It does not mention the relationship, nor is its scope limited to parties who have already consented to a relationship as in *Van Bergen*. As the Ninth Circuit held, "[t]he text of the TCPA makes clear that the availability of the exception depends exclusively on the purpose and content of the call. The relationship between caller and recipient, though not coincidental, does not bear on the exception's applicability." *Duguid*, 926 F.3d at 1155. *See also Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1149 (D. Minn. 2017) ("[I]n one sense [the TCPA government-debt exception] is relationship based . . . But that relationship is between the debtor and the government, whereas the debt collector initiating a telephone call often may be a third party that has no preexisting relationship with the debtor."). Therefore, the government-debt exception is content-based and is subject to strict scrutiny.

## 2. Whether the government-debt exception survives strict scrutiny

In order to survive strict scrutiny, the Government "must demonstrate that the TCPA's differentiation between [robocalls to collect a debt owed to or guaranteed by the United States] and other types of [robocalls] . . . furthers a compelling government interest and is narrowly tailored to that end." *Duguid*, 92 F.3d at 1155 (quoting *Reed*, 135 S. Ct. at 2231). "Importantly,

we focus our analysis on the content-based differentiation—the debt-collection exception—not

on the TCPA overall." *Id*. at 1155. *See also AAPC*, 923 F.3d at 167 ("[I]n order to survive strict

scrutiny, the Government must show that the debt-collection exemption has been narrowly

tailored to further a compelling governmental interest.").

The Government advances the governmental interest of "residential privacy." The

Government also states in a footnote that "because the TCPA prevents robocalls made to private

places beside the home (e.g., hospitals churches, and workplaces), it also advances interest

*beyond* residential privacy." Doc. 53, p. 11, n. 9 (emphasis in original). The Government does

not explain what those interests are or how they are furthered by the government-debt exception.

The Eighth Circuit has held residential privacy is not a compelling government interest.[9]

*Kirkeby v. Furness*, 92 F.3d 655, 659 (8th Cir. 1996) ("Although the interest [in protecting

---

[9] The Government cites two district court cases to support its proposition that the TCPA
promotes a compelling interest in residential privacy. However, the cases cited do not support
that proposition. Though a California district court in *Gallion* did find that "the TCPA as a
whole serves a compelling government interest" in residential privacy, *see Gallion v. Charter
Communications Inc.*, 287 F.Supp.3d 920, 929 (C.D. Cal. 2018), the Ninth Circuit in *Duguid*
subsequently held the inquiry should be narrowed to the government-debt exception, and that the
government-debt exception "hinders—not furthers—the government's asserted interest."
*Duguid*, 926 F.3d, at 1155. The Minnesota district court in *Greenley* also found "that [residential
privacy] is a compelling interest is well-established in the Eighth Circuit and elsewhere."
*Greenley v. Laborers' International Union of N. Am.*, 271 F.Supp.3d 1128, 1150 (D. Minn.
2017). However, in *Greenley*, neither party disputed the existence of a compelling interest.
Moreover, the cases cited by the *Greenley* court also do not support the conclusion that
residential privacy is a *compelling* interest to justify a content-based restriction. *See, e.g.*, *Van
Bergen v. State of Minn.*, 59 F.3d 1541, 1553–54 (8th Cir. 1995) (finding "residential privacy is a
significant government interest" in upholding a content-neutral state statute under intermediate
scrutiny); *Patriotic Veterans, Inc., v. Zoeller*, 845 F.3d 303 (7th Cir. 2017) (upholding state
statute as valid content-neutral time, place, and manner speech restriction and confirming the
"legitimacy" of the state's interest in preventing unwanted calls); *Cahaly v. Larosa*, 796 F.3d
399, 405 (4th Cir. 2015) ("assuming" the interest in protecting residential privacy and tranquility
is compelling for the purposes of holding that the state anti-robocall statute is was not narrowly
tailored to that interest). These cases do not establish that residential privacy is a compelling
interest in the Eighth Circuit. *Kirkeby* is controlling.

28

residential privacy and tranquility] is a 'substantial' one, the Supreme Court has never held that it is a compelling interest, and we do not think that it is." (internal citations omitted)).

Further, the Government does not meaningfully explain how the *government-debt exception* furthers its interest in residential privacy. *Carey v. Brown*, 447 U.S. 455 (1980), is instructive on this point. In *Carey*, Illinois asserted that "ensur[ing] privacy in the home" was a compelling interest justifying a state statute that generally prohibited residential picketing, but permitted picketing related to labor disputes in certain circumstances. *Carey*, 447 U.S. at 457. Though the Supreme Court acknowledged "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society," it nonetheless found the distinction in the statute had no bearing on that privacy interest. *Id*. at 465. "[T]he exclusion for labor picketing cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy. Appellant can point to nothing inherent in the nature of peaceful labor picketing that would make it any less disruptive of residential privacy than peaceful picketing on issues of broader social concern." *Id*.

The government-debt exception makes no attempt to accommodate privacy concerns, and the Government advances no justification for why calls pertaining to a debt owed to the government are any less of a nuisance or privacy invasion. It is precisely this underinclusivity that Defendants argue belies the Government's asserted interest. *See Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 345 (4th Cir. 2005) (finding that underinclusiveness is objectionable where "it renders implausible the government's claim that the regulation making this distinction is narrowly tailored to address a certain interest."). Therefore, even assuming residential privacy is a compelling interest, the government-debt exception does not further that interest. *See also*

*Duguid*, 926 F.3d at 1155 ("Permitting callers to collect government debt thus hinders—not furthers—the government's asserted interest.").

The government-debt exception is also not narrowly tailored to achieve its interest in privacy. "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). The Government first focuses its argument on the ATDS restriction as a whole, asserting "[t]he autodialer restriction's prohibition on unwanted robocalls is narrowly tailored because it restricts a limited method of communication—the use of certain technologies in placing calls—and only without the consent of the called party, making it closely drawn to the unwanted intrusions it aims to prevent." Doc. 53, p. 12. However, this analysis does not incorporate the government-debt exception at issue here. *See Duguid*, 926 F.3d at 1155 (". . . [T]he government would have us focus our analysis on the TCPA writ large rather than the debt-collection exception. It argues that the post-amendment statute, viewed holistically, remains narrowly tailored to protect personal and household privacy. This gloss-over approach is at odds with *Reed*, which directs that the tailoring inquiry focus on the content-based differentiation—here, the debt-collection exception.").

The Government next asserts that the government-debt exception is "limited by the fact that such calls would only be made to those who owe a debt to the federal government." Doc. 53, p. 13 (quoting *Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036, 1047 (N.D. Cal. 2017)). However, the terms of the government-debt exemption are not so limited. The exemption states that the ATDS restriction does not apply to calls "made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). It does not require these calls to be made only to the debtors themselves. Presumably the calls could be made to any relevant

person so long as the purpose of the call was to collect a government debt. Moreover, the statistics reviewed by other courts ruling on the government-debt exception draw into question how limited of an exception this is given the substantial number of people owing debt to the federal government. *See, e.g.*, *AAPC*, 923 F.3d at 168 ("An FCC report [] revealed that more than 41 million borrowers owed over one trillion dollars in federal student loans. Notably, student loan debt . . . is but one category of debt that is guaranteed by or owed to the federal government").

Lastly, the Government argues the government-debt exception is limited because it "may also be cabined by the TCPA's express grant of authority to the FCC to 'restrict or limit the number and duration of calls made . . . to collect a debt owed to or guaranteed by the United States." Doc. 53, p. 13 (quoting 47 U.S.C. § 227(b)(2)(H)). That the FCC may in the future further tailor the applicability of the government-debt exception does not make the current content-based statute narrowly tailored. The language in the statute is permissive, ("In implementing the requirements of [subsection (b)], the Commission may restrict or limit the number and duration of calls made . . . to collect a debt owed to or guaranteed by the United States," 47 U.S.C. (b)(2)(H)), and the mere possibility of future narrow tailoring by the FCC does not provide a sufficient basis to conclude the statute on its face is narrowly tailored.

Therefore, the government-debt exception fails strict scrutiny, and the Court must now determine whether it is severable from the TCPA.

### 3. Whether the government-debt exception is severable from the TCPA

Whether an unconstitutional provision can be separated to preserve the remainder of the statute "is largely a question of legislative intent, but the presumption is in favor of severability. 'Unless it is evident that the Legislature would not have enacted those provisions which are

within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'"  *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)).  A severability clause in the statute "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision*.*"  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

Plaintiff and the Government contend the government-debt exception is severable, relying largely on the recent Fourth Circuit and Ninth Circuit decisions finding the government-debt exemption fails strict scrutiny but is nevertheless severable.  *Duguid*, 926 F.3d at 1149; *AAPC*, 923 F.3d at 171.  The Government adds that both the severability provision and the TCPA's more than two decades of operation prior to the government-debt exception indicates the exception is severable.  Defendants respond[10] that the *Duguid* and *AAPC* courts relied on a dated severability clause, and that the legislative history of the TCPA and the timing of the government-debt exception amendment indicate "Congress intended the restrictions to work in tandem with the government-debt exemption, and thus it cannot be severed."  Doc. 54, p. 8.  Defendants further assert that the proper remedy is to strike down the entire ATDS restriction, not enlarge their scope, in the interest of avoiding penalizing more speech to cure the defect.

---

[10] The Defendants also argue that "Plaintiff is requesting that the constitutionally-repaired version of the TCPA be applied retroactively to Defendants' conduct. This violates principles of retroactivity."  Doc. 51, p. 2.  Generally retroactivity is implicated when a "new provision attaches new legal consequences to events complete before its enactment."  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269 (1994).  "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."  *Id.* at 265.  Severance of the government-debt collection provision does not attach "new legal consequences" to Defendants' alleged activity.  The exact TCPA provisions that Plaintiff has alleged Defendants' activities violated remain the same.  Further, the class period alleged here began before the government debt exception was enacted.  Therefore, the Defendants' retroactivity concerns are unfounded.

To support their argument, Defendants cite *Rappa v. New Castle Ct.*, where the Third Circuit struck down an entire statute restricting speech rather than the exception to the statute because "eliminating the offending exception would mean that we would be requiring the State to restrict more speech than it currently does." 18 F.3d 1043, 1072–73 (3d Cir. 1994). The Third Circuit found severance was not the proper remedy "absent quite specific evidence of legislative preference for elimination of the exception." *Id*. at 1073. Delaware's severability clause, which applied to its entire civil and criminal code, was not specific enough evidence. *Id*.

Here, however, evidence in favor of severability is not so vague. The applicable severability clause enacted by Congress applies to the Telecommunications Title subchapter regarding Wire or Radio Communication. 47 U.S.C. § 608 ("If any provision of this chapter [containing the TCPA] . . . is held invalid, the remainder . . . shall not be affected thereby."). It does not apply to the entire U.S. Code, or even the entire Telecommunications Title. This severability clause is sufficiently specific and "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision*." Alaska Airlines,* 480 U.S. at 686. Moreover, the TCPA was enacted in 1991 and operated without the government-debt exception until 2015 when it was amended. If the government-debt provision is severed, the TCPA remains "fully operative as law" as it did prior to the amendment. "The newly enacted exception did not suddenly and silently become so integral to the TCPA that the statute could not function without it." *Duguid*, 926 F.3d at 1157.

Defendants are correct that, as with all statutory amendments, Congress likely intended the ATDS restrictions to work in tandem with the exemptions. However, Congressional intent that a statute's provisions function in harmony with subsequent amendments does not compel the conclusion that Congress intended those subsequent amendments to be unable to be severed.

Given the general presumption in favor of severability, the apparent Congressional intent that the unconstitutional provision be severed, and the TCPA's demonstrated ability to be fully operative without the severed provision, the Court finds the government-debt exception is severable. Other courts have found the same. *See, e.g.*, *Perrong*, 2019 WL 4751936; *Wilson v. PH Phase One Operations L.P.*, No. CV DKC 18-3285, 2019 WL 4735483 (D. Md. Sept. 27, 2019); *Katz v. Liberty Power Corp., LLC*, No. 18-CV-10506-ADB, 2019 WL 4645524 (D. Mass. Sept. 24, 2019); *Duguid*, 926 F.3d at 1157; *AAPC*, 923 F.3d at 171. Therefore, Defendants' motion to dismiss on the ground that the government-debt exception is unconstitutional and unseverable is denied.

### ii. ATDS Government-Speaker Exemption

Having severed the government-debt exception, the Court considers Defendants' remaining arguments with respect to the ATDS restrictions. Defendants contend that the fact that the statute does not include government entities within the definition of "person" and the FCC's subsequent ruling that "government agents communicating 'authorized' messages are also exempt" indicates a "content-based preference for government messages, regardless of the speaker's identity and independently triggers strict scrutiny." [11]    Doc. 34, p. 12.

The TCPA provision prohibiting the use of ATDS applies to "any person within the United States, or any person outside the United States if the recipient is within the United States". 47 U.S.C. §227(b)(1)(A)(iii). The TCPA itself does not define "person," but the

---

[11] As noted above, the Court does not have the subject matter jurisdiction to evaluate the constitutionality of an FCC Order, and at oral argument Defendants clarified they do not wish to challenge the constitutionality of the FCC's rulings. Therefore the Court will not consider this ruling for the purposes of its analysis. The remainder of Defendants' argument rests on the Communications Act's definition of "person."

Communications Act of 1932, which the TCPA amended, provides that "[t]he term 'person' includes an individual, partnership, association, joint-stock company, trust or corporation." 47 U.S.C. § 153(39).

As an initial matter, although the Supreme Court has held the federal government and its agencies are not subject to the TCPA provisions, *see Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016), as revised (Feb. 9, 2016), it is not clear that the Defendants are correct in their assertion that the statute excludes *all* government entities from the definition of a person. The language of § 153(39) provides that the term 'person' *includes* an individual, partnership, association, joint-stock company, trust or corporation, but the text itself does not strictly limit 'person' to those terms. When used in a statutory definition, "the word 'includes' . . . 'is usually a term of enlargement, and not of limitation.'" *Pattison Sand Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 688 F.3d 507, 513 (8th Cir. 2012) (quoting *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008)). *See also Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1141–42 (D. Minn. 2017) (quoting *In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 946 (8th Cir. 2007)) (concluding that "the TCPA's definition of 'person' prefaces its list with the word 'includes.' This term 'suggests Congress was being illustrative rather than exclusive with the list following the phrase'"). Moreover, the majority of the almost sixty other definitions listed in § 153 use the phrasing "means" rather than "includes," suggesting that if Congress had wanted the terms listed in the definition of 'person' to be a limitation, it would have phrased it accordingly. *See, e.g.*, 47 U.S.C. § 153(42) ("The term 'radio station' or 'station' means a station equipped to engage in radio communication or radio transmission of energy").

There are also conflicting interpretations among other courts. *See, e.g.*, *Schuppe v. Harris & Harris, Ltd.*, No. 18 C 8221, 2019 WL 2473832, at *2 (N.D. Ill. June 13, 2019)

(temporarily declining to address the interpretation of the definition of "person" where a local government contractor contended it was not a 'person' under the TCPA, because it was "hesitant to make a definitive ruling on the issue prior to receiving direction from the FCC");  *Lambert v. Seminole Cty. Sch. Bd.*, No. 6:15-CV-78-ORL-18DAB, 2016 WL 9453806, at *3 (M.D. Fla. Jan. 21, 2016) (finding that a Plaintiff could not sustain a TCPA action against a local school board because "conspicuously absent" from the definition of "person" was "any mention of governmental entities, let alone a phrase that may reasonably construed as encapsulating a sovereign").

Even assuming the 47 U.S.C. § 153(39) definition as used in the TCPA does exclude government entities, there is no evidence that this is a content-based preference under the *Reed* analysis.  Under *Reed*'s first step, § 153(39) on its face is not content-based.  The provision lists parties who are defined as "person" under the Communications Act.  It says nothing about the content of their communication.  Defendants assert that this speaker preference reflects a content preference for certain types of speech. "[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 658 (1994).  However, there is no evidence that failure to include government speakers in the definition of "person" reflected an effort by Congress to favor its own message or those of other government entities.  Therefore the alleged government-speaker exemption is not subject to strict scrutiny.

Assuming the 47 U.S.C. § 153(39) definition of "person" as used in the TCPA does exclude government entities, it is constitutional as a reasonable time, place, and manner restriction under intermediate scrutiny.  A content-neutral law that regulates speech is valid if the restrictions "are justified without reference to the content of the regulated speech, [] narrowly

tailored to serve a significant governmental interest, and [] leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

First, the ATDS restriction and its alleged government-speaker exemption can be justified without reference to the content of the speech. Congress has chosen to regulate the telemarketing practices that the record reflected were the most intrusive due to their unexpected and frequent nature. H.R. Rep. No. 102-317, at 16 (1991) (stating that the committee reviewed data from states demonstrating that "consumer complaints about unsolicited telemarketing involved calls that were mostly commercial in nature.") The record does not indicate calls from government sources were necessarily among the nuisance calls that consumers were concerned about.

Moreover, the Government offers a broader justification as to why the government would be exempt. First, that the TCPA's definition does not explicitly include the federal government is not a speaker-preference but rather a reflection of its inherent sovereign immunity. *Campbell-Ewald Co.*, 136 S.Ct. at 673 ("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions because no statute lifts their immunity.").

Further, the Government argues that the Government is permitted to subject its own speech to differing requirements and it has "never been thought to raise First Amendment concerns." Doc. 53, p. 8. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech. A government entity has the right to speak for itself. It is entitled to say what it wishes, and to select the views it wants to express." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) (internal citations and quotations omitted). *See also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015)

("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and it carries out its duties on their behalf.")  Even assuming the TCPA does not apply to government entities, the fact that Congress chose not to include a restriction on government's speech is consistent with this principle.  *See also Mejia*, 2017 WL 3278926, at *15 (holding that "the mere absence of liability for government speakers [under the TCPA] does not raise a First Amendment problem," relying in part on sovereign immunity grounds).  The Government has justified the alleged exemption without reference to the content of the speech.

Second, the Eighth Circuit has concluded "residential privacy" is a substantial governmental interest, *Kirkeby*, 92 F.3d at 659, and the history of the TCPA indicates its goal in enacting the restrictions was to regulate "intrusive, nuisance calls to [consumers'] homes from telemarketers," Pub. L. No. 102-243, 105 Stat. 2394 (1991).  By targeting such telephone solicitations, Congress has narrowly tailored the restriction to this privacy interest.  *See Van Bergen*, 59 F.3d at 1555 (finding Minnesota's TCPA analogue was narrowly tailored to reach the substantial interest in limiting the use of unsolicited, unconsented-to autodialed calls because "the statute does not foreclose an entire medium of expression, and the limits on [autodialed] calls are designed to remedy the problems perceived the liberal use of [autodialer] technology." (internal citation omitted)).

Finally, the restrictions leave open ample alternative channels for communication.  The Government contends, "should Defendants wish to contact prospective customers, they may use an autodialer to do so after obtaining the person's consent, or may contact the person without using an autodialer."  Doc. 53, p. 12.  These alternative channels for communication are sufficient.  *See Moser v. F.C.C.*, 46 F.3d 970, 975 (9th Cir. 1995) ("The restrictions in the

[TCPA] leave open many alternative channels of communication, including the use of taped messages introduced by live speakers or taped messages to which consumers have consented, as well as all live solicitation calls. That some companies prefer the cost and efficiency of automated telemarketing does not prevent Congress from restricting the practice.").

Defendants' underinclusivity arguments fail with respect to this alleged exemption. It is well established that legislatures are not required to regulate all speech or no speech. The Supreme Court has rejected the argument "that failure to regulate all speech renders the statute fatally underinclusive." *Burson v. Freeman*, 504 U.S. 191 (1992) (holding that a Tennessee statute restricting vote solicitation but not charitable or commercial solicitation did not violate the First Amendment, because the state had evidence that vote solicitation on election day was the predominant issue, and "States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist"). *See also City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Legislatures may implement their program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations."); *Nat'l Fed'n of the Blind v. F.T.C.*, 420 F.3d 331, 349 (4th Cir. 2005) ("We have no warrant to prevent the government from addressing a problem one step at a time . . . We thus need not prevent the government from confronting problems incrementally; to do so would ignore the warning that the government is not required to make progress on every front before it can make progress on any front.")

Underinclusiveness is objectionable where "it renders implausible the government's claim that the regulation making this distinction is narrowly tailored to address a certain interest." *Nat'l Fed'n of the Blind*, 420 F.3d at 345. As discussed, the regulation is narrowly

tailored to the Government's substantial interest in residential privacy, and the fact that it may

not apply to government entities does not render this interest implausible.

Therefore, even assuming ATDS restrictions do not apply to government entities, it is a

valid time, place, and manner restriction on speech. *See Duguid v. Facebook, Inc.*, 926 F.3d

1146, 1153 (9th Cir. 2019) ("We have repeatedly affirmed that the pre-[government-debt]

amendment TCPA was content-neutral and consistent with the First Amendment" under the

intermediate scrutiny standard). Defendants' motion to dismiss on this ground is denied.

### iii.  Non-Profit Exemption

Defendants also challenge the TCPA's exemption of non-profits from its definition of

"telephone solicitation," as incorporated in the national-do-not-call registry provision, and from

the prohibition on calls placed for telemarketing purposes. Defendants assert that "[b]ecause the

statutory and regulatory definitions of 'telephone solicitation' exempt non-profit organizations,

the NDNCR provisions contain speaker-based exemptions" that should be subject to strict

scrutiny. [12] Doc. 34, p. 2.

Defendants assert that the "Section 227(c)(5) of the TCPA imposes liability for placing

more than one 'telephone solicitation' in a twelve-month period to a number on the NDNCR."

Doc. 34, p. 2. It is unclear whether the TCPA standing alone imposes such a restriction on

speech by defining "telephone solicitation" without a corresponding prohibition and by

providing a private right of action for violation of the regulations, but not the statute. However,

---

[12] As discussed above, the Court does not have subject matter jurisdiction to determine the
validity of the FCC's regulations. The remainder of Defendants' claim that the non-profit
exemption is unconstitutional is rooted in the TCPA's definition of "telephone solicitation" and
its private right of action for violations of regulations promulgated pursuant to § 227(c).

to the extent that the statute's definition of telephone solicitation, directives to the FCC to implement regulations concerning telephone solicitations, and private right of action imposing liability for violations of the regulations may evince a preference for certain speech, the Court finds it to be constitutional.

Defendants contend that the exemption of non-profits is a speaker preference that reflects a content preference, and therefore it should be subject to strict scrutiny under *Reed*. Under the first step in the *Reed* analysis, the non-profit exemption is content-neutral on its face. The text of the statute provides that "telephone solicitation . . does not include a call or message . . . by a tax exempt nonprofit organization." 47 U.S.C. §227(a)(4). It makes no reference to the content of the calls tax exempt non-profits are permitted to make. A non-profit could place the exact same call as a party making a commercial telephone solicitation, and its status as a non-profit would exempt it from the statute.

Defendants contend that the nonprofit exemption is nevertheless subject to strict scrutiny because it cannot be justified without reference to the content of the speech. They assert that "[f]or-profit and non-profit entities are distinguished by law and, by definition, pursue differing objectives. That the content of the communications or the viewpoints they advocate for would differ is apparent." Doc. 54, p. 11. However, when confronted with a similar argument in *Turner Broadcasting System, Inc., v. F.C.C.*, the Supreme Court rejected the argument that a regulation that differentially regulated broadcast and cable programming was content-based because "the preference for broadcast stations *automatically* entails content requirements." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 649 (1994) (emphasis in original) (internal quotations omitted). The Supreme Court found that even though the external regulation of broadcast programming versus cable programming meant the content between the two inevitably

differed, "it does not follow that Congress mandated cable carriage of broadcast television stations as a means of ensuring that particular programs will be shown, or not shown, on cable systems." *Id*. at 649–50.

Moreover, the Congressional record here is clear that the TCPA was enacted to target unexpected, frequent solicitations, and that non-profits were exempted because the record reflected that calls from non-profits were more expected and less frequent. H.R. Rep. No. 102-317, at 16 (1991) ("In addition to the relative low volume of non-commercial calls, the Committee also reached the conclusion, based on the evidence, that such calls are less intrusive to consumers because they are more expected. Consequently, the two main sources of consumer problems—high volume of solicitations and unexpected solicitations—are not present in solicitations by nonprofit organizations") (The record "does not contain sufficient evidence to demonstrate that calls from these tax exempt nonprofit organizations should be subject to the restrictions . . . Complaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations.") The statute and the Congressional record make no reference to the subjects of the calls non-profits are permitted to make. The Court finds the non-profit exemption is content-neutral and therefore not subject to strict scrutiny.

Plaintiff and the Government argue that the applicable standard of review is either intermediate scrutiny, which is applied to content-neutral time, place, and manner restrictions, or the *Central Hudson* commercial speech analysis. In *Central Hudson*, the Supreme Court established a four-part test to review challenges to restrictions on commercial speech, defined as "expression related solely to the economic interests of the speaker and its audience." *Central*

*Hudson Gas & Electric Corp. v. Public Serv. Comm'n of NY*, 447 U.S. 557, 561 (1980). The

*Central Hudson* test requires this Court to determine:

> (1) whether the commercial speech at issue concerns unlawful activity or is misleading; (2) whether the governmental interest is substantial; (3) whether the challenged regulation directly advances the government's asserted interest; and (4) whether the regulation is no more extensive than necessary to further the government's interest.

*1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1055 (8th Cir. 2014). The TCPA

defines "telephone solicitation" as:

> the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

47 U.S.C. § 227(a)(4). The definition limits its applicability to callers with an economic motive,

which is "expression related solely to the economic interests of the speaker and its audience."

*Central Hudson*, 447 U.S. at 461. Moreover, though the Eighth Circuit has not considered the

constitutionality of the telephone solicitation definition, it has considered and upheld the TCPA's

ban on unsolicited fax advertisements after applying the *Central Hudson* commercial speech test.

*See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 658 (8th Cir. 2003). Therefore,

the Court will apply the *Central Hudson* inquiry to the telephone solicitation definition.[13] *See*

---

[13] Other courts have analyzed the TCPA as a whole as a content-neutral time, place, and manner restriction subject to intermediate scrutiny. *See, e.g.*, *Moser v. F.C.C.*, 46 F.3d 970, 973 (9th Cir. 1995) (upholding the TCPA provision restricting automated telemarketing calls as a content-neutral time, place, and manner restriction). These standards, however, are quite similar and therefore applying the time, place, and manner intermediate scrutiny analysis would not produce a different outcome here. *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989) (stating that "the application of the *Central Hudson* test was 'substantially similar' to the application of the test for validity of time, place, and manner restrictions upon protected speech"); *Passions Video, Inc. v. Nixon*, 458 F.3d 837, 841–42 (8th Cir. 2006) ("Regulations on commercial speech are subject to intermediate scrutiny under the framework set forth in *Central Hudson*"); *Moser v. F.C.C.*, 46 F.3d 970, 973 (9th Cir. 1995) ("[T]he tests for time, place, and

*also Mainstream Mktg. Servs., Inc. v. F.T.C.*, 358 F.3d 1228, 1236 (10th Cir. 2004) (upholding

the national-do-not-call registry under the *Central Hudson* test after finding "[t]he national do-

not-call registry's telemarketing restrictions apply only to commercial speech.")

First, the definition of telephone solicitation does not solely pertain to unlawful or

misleading activity, therefore the regulated speech is protected by the First Amendment.  Second,

the Eighth Circuit has conclusively held that "[r]esidential privacy is a significant government

interest."  *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1554 (8th Cir. 1995) (upholding a state

analogue of the TCPA as a content-neutral time, place, or manner restriction);  *Fraternal Order*

*of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591, 597 (8th Cir. 2005) ("[R]esidential

privacy is a significant government interest, particularly when telemarketing calls are

flourishing, and becoming a recurring nuisance by virtue of their quantity" (internal quotations

omitted)).

Third, the restriction must directly advance the state's asserted interest.  "This step

concerns the relationship between the harm that underlies the State's interest and the means

identified by the State to advance that interest."  *Passions Video, Inc. v. Nixon*, 458 F.3d 837,

842 (8th Cir. 2006).  The harm Congress identified when enacting the TCPA was frequent and

unexpected commercial solicitations, and the legislative history reviewed above indicates "the

two main sources of consumer problems—high volume of solicitations and unexpected

solicitations—are not present in solicitations by nonprofit organizations."  H.R. Rep. No. 102-

317, at 16 (1991).  Further, the use of telephone solicitation in the statute applies to the potential

creation of a national do-not-call registry, wherein users affirmatively represent that an

---

manner restrictions for content-neutral speech and regulations for commercial speech regulations
are essentially identical").

unconsented telephone solicitation is unwanted.  Therefore, the legislative history and the means

adopted by Congress to further the interests of preventing unwanted calls directly advances  the

goal of reducing the prevalence of unwanted calls. *See Missouri ex rel. Nixon*, 323 F.3d at 658

(quoting *United States v. Edge Broad. Co.*, 509 U.S. 418, 432–34 (1993)) ("By placing

restrictions on those responsible for a large portion of the problem, TCPA directly and materially

advances the congressional goal of limiting the harm arising from unsolicited fax advertisements.

Congress is not required to 'make progress on every front before it can make progress on any

front.'");  *Mainstream Mktg. Servs.*, 358 F.3d at 1245 (reviewing the non-profit exemption in the

national-do-not-call registry and finding it was "narrowly tailored to restrict only speech that

contributes to the problems the government seeks to redress, namely the intrusion into personal

privacy and the risk of fraud and abuse caused by telephone calls that consumers do not welcome

into their homes.").

Finally, the definition of telephone solicitation does not burden more speech than is

necessary to further the State's interest in residential privacy.  Congress identified unwanted,

frequent commercial solicitations to be the predominant harm targeted by the TCPA and crafted

this statutory provision to directly address that.  Further, "a content-neutral and viewpoint-neutral

opt-in provision like the one here limits the degree of government interference with First

Amendment interests." *Fraternal Order of Police, N.D. State Lodge v. Stenehjem*, 431 F.3d 591,

599 (8th Cir. 2005) (upholding the North Dakota statute prohibiting solicitation of "do not call"

registrants under an intermediate scrutiny review).

Therefore, the non-profit exemption from the definition of "telephone solicitation"

survives *Central Hudson*'s commercial speech test and is constitutional.  Defendant's motion to

dismiss on this ground is denied.

### b. Equal Protection

Defendants also claim the TCPA violates the Equal Protection Clause, arguing Plaintiff cannot show the "differential treatment" of different types of speech survives equal protection scrutiny, because "[t]he Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives" and "for the same reasons stated above, the restrictions are not narrowly tailored to their intended interest." Doc. 34, p. 14. Because Defendants do not advance any new arguments with respect to the alleged equal protection violation and the Court has fully addressed their First Amendment claims above, it need not decide the issue. "'It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights.'" *Hill v. City of Scranton*, 411 F.3d 118, 126 (3d Cir. 2005) (quoting Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 18.40, at 796 (3d ed.1999)) (holding that because Plaintiffs' "First Amendment and Equal Protection claims are functionally identical [] it would be redundant to treat them separately . . . We will examine the [plaintiffs'] First Amendment retaliation claim directly rather than as a component of their derivative equal protection claim"); *see also Sherbert v. Verner*, 374 U.S. 398, 409 (1963) (finding that after holding the plaintiff's First and Fourteenth Amendment guarantee of free exercise of religion had been violated by a state's denial of unemployment benefits, it need not consider whether the state's action had also deprived her of equal protection).

Further, the only case cited by Defendants to support their equal protection argument is distinguishable. The speech restriction in *Police Department of the City of Chicago v. Mosley*

concerned what the Supreme Court had determined was a content-based restriction on speech. 408 U.S. 92, 96 ("[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.")  Here, the Court has already determined the alleged government-speaker exemption and non-profit exemption are content-neutral, and thus *Mosley*'s analysis is inapplicable.  Therefore, the Court does not decide the Equal Protection question.

### c.  Fifth Amendment Due Process Clause

Lastly, Defendants assert that the TCPA ATDS provisions are unconstitutionally vague because the ATDS definition "fail[s] to give a person of ordinary intelligence adequate notice of what constitutes an ATDS."  Doc. 34, p. 15.  The Government responds that Defendants' claim "amounts to a complaint that the TCPA does not precisely identify all devices that qualify as an ATDS," which should fail because the TCPA "uses words of common understanding" that courts have been able to apply with standard statutory interpretation, including for the eleven years after the statute was enacted but before any regulations elaborating on the ATDS definition were adopted.  Doc. 53, p. 15.

The TCPA defines an ATDS as "equipment which has the capacity— (A) To store or produce telephone numbers to be called, using a random or sequential number generator; and (B) To dial such numbers."  47 U.S.C. § 227(a)(1).

 "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "Under the void-for-vagueness doctrine, a law is unconstitutional if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (internal quotations omitted). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

The ATDS definition is not unconstitutionally vague. The statute uses common words that give a person of ordinary intelligence a reasonable opportunity to know the types of dialing systems the TCPA prohibits. When deciding whether a statute is unconstitutionally vague, "[c]ommon sense must not be and should not be suspended." *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006). A caller of ordinary intelligence is on notice that if they use a system that is storing or producing numbers using a random or sequential number generator, and then dialing those numbers, they may come within the scope of the statute's prohibition. That Congress may, "without difficulty, have chosen clearer and more precise language equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 94 (1975) (internal quotations and alterations omitted). *See Van Bergen*, 59 F.3d at n. 6 (rejecting a vagueness challenge to the Minnesota TCPA analogue which the court determined was "virtually identical" to the TCPA with two exceptions); *Wilson*, 2019 WL 4735483, at *7 ("Thus, although technical, the TCPA's definition of an ATDS is set out in terms that an ordinary person exercising ordinary common sense can understand sufficiently and comply with.").

To demonstrate the statute's vagueness, Defendants rely in part on a D.C. Circuit decision finding the FCC's interpretation of what constitutes an ATDS to be overbroad, asserting this "underscores the lack of clarity concerning conduct that is—and is not—unlawful." Doc. 51, p. 3. In 2018 the D.C. Circuit reviewed and struck down the FCC's most recent

interpretation of ATDS, finding the FCC's ruling, which seemingly would include all smartphones as autodialers, was an "unreasonably, and impermissibly, expansive one" that in "describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking." *ACA Int'l v. F.C.C.*, 885 F.3d 687, 700, 703 (D.C. Cir. 2018). The case did not raise the issue of whether the statute was unconstitutionally vague, and therefore the D.C. Circuit's determination that the FCC's overbroad rulings that have since been struck down left the public in a "significant fog of uncertainty" is not determinative.

Defendants also point to the fact that after *ACA International*, courts have come to different conclusions about the scope of what constitutes an ATDS, "further demonstrating that the ATDS restrictions are void for vagueness." Doc. 51, p. 3. However, "[a]lthough there may be issues of interpretation regarding the meaning of a statute, that in itself does not give rise to a finding of unconstitutional vagueness." *Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998). "A statute is not necessarily void for vagueness simply because it may be ambiguous or open to two constructions." *Williams v. Brewer*, 442 F.2d 657, 660 (8th Cir. 1971). *See also Henry v. Radius Glob. Sols., LLC*, 357 F. Supp. 3d 446, 459 (E.D. Pa. 2019) ("Mere disagreement amongst courts over the interpretation of a statute does not render the statute unconstitutionally vague."). Courts after *ACA International* have been able to apply standard tools of statutory interpretation to come to and apply a workable definition of an ATDS. That courts have come to different conclusions in their interpretations does not render the statute unconstitutionally vague. *See, e.g.*, *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018); *Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018); *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606 (N.D. Iowa 2019). Here, whatever ambiguity the ATDS definition may exhibit, it does not rise to the level of unconstitutional vagueness.

Defendants further argue that "as applied here . . . nothing in the statute's language indicated that it applied broadly to a web-based platform that could not send text messages without human intervention at every phase of the process." Doc. 34, p. 15. However, as the Plaintiff notes, "[t]he systems described in the Complaint dial numbers from a stored list— precisely what is prohibited by statute and something years of case law and regulation should have put Defendants on notice of." Doc. 49, p. 15. Further, Plaintiff's first amended Complaint alleges that the text messages at issue are sent without human intervention. *See* Doc. 20, ¶ 52. Accepting Plaintiff's factual allegations as true as the Court must at this stage, *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015), the ATDS definition is not unconstitutionally vague as applied to the system alleged here. *See Wilson*, 2019 WL 4735483, at *8 (rejecting an identical vagueness challenge to the ATDS definition because "[t]he statute prohibits calls made by software with the capacity to store or produce telephone numbers to be called, using a random or sequential number generator. Plaintiff alleges that Txt Live! is such a device in the complaint. Accordingly, the TCPA's definition of an ATDS is not unconstitutionally vague."). Defendants' motion to dismiss on vagueness grounds is denied.

## IV. CONCLUSION

For the reasons discussed above, the motion to dismiss by Defendants is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge


Dated: December 3, 2019
Jefferson City, Missouri